**In re William Russell DOUGHERTY, Debtor.**

**David S. Karton, a Law Corporation, Plaintiff,**

v.

**William Russell Dougherty, Defendant.**

**Bankruptcy No. LA99–46401TD.**

**Adversary No. AD00–02298TD.**

United States Bankruptcy Court, C.D. California.

Feb. 26, 2002.

---

Jeffrey C. Krause, Stutman, Treister & Glatt, Los Angeles, CA, for plaintiff.

Lawrence J. Fallon, Severson & Werson, San Francisco, CA, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW; AND JUDGMENT

THOMAS B. DONOVAN, Bankruptcy Judge.

The above-captioned adversary proceeding came on for trial before me on January 30, 2002. Jeffrey C. Krause, a member of Stutman, Treister & Glatt Professional Corporation, appeared on behalf of Plaintiff, David S. Karton, a Law Corporation ("Karton"). Jeffrey Hagen, a member of Hagen & Hagen, appeared on behalf of defendant, Dr. William Russell Dougherty ("the Debtor"). Having considered the arguments of counsel, the evidence submitted prior to the trial, the testimony at trial, and this court's records in the above-captioned case under Title 11 and the above-captioned adversary proceeding, and good cause appearing,

NOW, THEREFORE, I make the following findings of fact and conclusions of law:

### *Findings of Fact*

1. The Debtor is the debtor in the above-captioned case under chapter 7. The Debtor commenced this case under Title 11 by filing a voluntary chapter 13 petition on October 4, 1999 (the "Petition Date"). The Debtor converted his case from a case under chapter 13 to a case under chapter 7 on April 12, 2000 (the "Conversion Date").

2. Karton is a creditor of the Debtor and obtained the entry of a superior court default judgment for a recovery against

the Debtor of in excess of $80,000 on August 11, 1998 (the "Karton Judgment"). The Debtor has filed motions to vacate the Karton Judgment, but the superior court has not vacated the Karton Judgment.

3. The claim that is the subject of the Karton Judgment is for legal services Karton provided to the Debtor. Karton represented the Debtor in connection with his marital dissolution proceeding and other matters, including assisting the Debtor in obtaining a loan. Because the Debtor could not obtain such a loan directly, the Debtor's parents, Harry and Mary Dougherty (the "Debtor's Parents"), obtained a loan secured by a deed of trust on their principal residence with the understanding that the Debtor's Parents would loan the proceeds of that loan (the "Loan Proceeds") to the Debtor. A true and correct copy of a letter relating to this loan and the uses of the Loan Proceeds is attached to the Joint Pre–Trial Stipulation (the "Stipulation"). That letter is dated October 28, 1998 and was countersigned by the Debtor on November 11, 1998.

4. Prior to the Petition Date, the Debtor maintained checking account number 0645–600–529 at the branch of the Wells Fargo Bank located at 433 N. Camden Drive, Beverly Hills, California 90212 (the "Original Checking Account"). Based on the services provided by Karton to the Debtor and the payments the Debtor had previously made to Karton drawn on the Original Checking Account, Karton had actual knowledge of the existence of the Original Checking Account. The Debtor knew that Karton was aware of the existence of the Original Checking Account at all relevant times.

5. During December 1998, the Debtor's Parents delivered to the Debtor a check funding the loan from the Debtor's Parents to the Debtor (the "Loan"). The Debtor deposited the Loan Proceeds into a new account, account number 6495–097115 (the "Loan Proceeds Account"). The Debtor opened the Loan Proceeds Account at a different Wells Fargo branch than the Original Checking Account. The Debtor used the Loan Proceeds Account to pay some of the costs of renovating his home and other living expenses. The Debtor did not inform Karton that he had opened the new Loan Proceeds Account, and the Debtor made no payments to Karton from the Loan Proceeds Account.

6. On August 27, 1999, Karton caused a writ of execution to enforce the Karton Judgment (the "Writ") to be levied against both an account held by Karton for the Debtor and the Original Checking Account. The levying officer received approximately $56,000 as a result of levying the Writ on both accounts (the "Levied Cash").

7. During the chapter 13 case the Debtor asserted that Karton's lien on the Levied Cash was avoidable as a preference under 11 U.S.C. § 547(b). If the Debtor were able to recover the Levied Cash, he told me and Karton during the chapter 13 proceedings that he intended to use it to complete the renovation of his principal residence, which he claimed as exempt. Because the Debtor's chapter 13 plan was never confirmed, the Debtor never brought the preference action and the Levied Cash remains sequestered.

8. At some point between the levy on the Levied Cash and the close of business on August 30, 1999, the Debtor delivered to his accountant William Davidson checks made payable to the Debtor and asked Davidson to open a client trust account for the Debtor (the "Trust Account"). Davidson opened the Trust Account on August 31, 1999. At no time prior to the levy of the Writ on the Levied Cash had the Debtor delivered any checks or money to Davidson to hold in trust for the Debtor.

Prior to that date the Debtor had maintained and personally managed the Original Checking Account, using Quicken software for that purpose.

9. From and after the opening of the Trust Account through the Conversion Date, all checks the Debtor received were delivered to Davidson, who deposited them into the Trust Account. No additional deposits were made into the Original Checking Account after the levy of Karton's Writ.

10. Davidson paid from the Trust Account only those bills that the Debtor expressly instructed him to pay. Davidson did not prepare a budget for the Debtor or exercise independent discretion or judgment in determining which checks to write on the Trust Account.

11. The balance in the Trust Account on the Petition Date was $12,540. Neither this balance nor the existence of the Trust Account was disclosed in either (a) the Schedules of Assets and Liabilities or Statement of Financial Affairs filed by the Debtor's original bankruptcy counsel, Speros Maniates, on October 19, 1999 (collectively the "Original Schedules"), or (b) the Amended Schedules of Assets and Liabilities or Statement of Financial Affairs filed by Mr. Hagen on November 22, 1999 (the "Amended Schedules"). The court takes judicial notice of the Debtor's Original Schedules, Amended Schedules, and all declarations filed by the Debtor in his bankruptcy case.

12. The Debtor established the Trust Account with the actual intent to hinder, delay, or defraud at least one creditor, that is, Karton. The Debtor has admitted that he established that account to hinder and delay the enforcement of the Karton Judgment. The Debtor compounded this misconduct by then concealing the establishment of the Trust Account and by making intentional fraudulent transfers into that account.

13. The Debtor did not sign his Original Schedules, but he acknowledged in a declaration filed with this court on November 22, 1999 and on cross-examination at trial that he authorized Mr. Maniates to sign the Original Schedules on his behalf.

14. On November 10, 1999, Karton filed a motion to dismiss the Debtor's chapter 13 case, alleging it was improperly filed as a case under chapter 13, and a motion for relief from the automatic stay. Both motions were premised in part on (a) the amount of the non-contingent, liquidated, unsecured debts reflected in the Original Schedules and the debt limits set forth in 11 U.S.C. § 109(e) for qualification as a chapter 13 debtor; and (b) the inaccuracies contained in the Original Schedules. The Debtor opposed those motions contending, in part, that the errors contained in the Original Schedules were the responsibility of Mr. Maniates. The Debtor did not amend the Original Schedules until after Karton filed his motions to dismiss and for relief from the automatic stay which brought many of the Debtor's errors in the Original Schedules to my attention.

15. The Debtor's Parents filed a proof of claim prior to the conversion of the Debtor's case from chapter 13 to chapter 7. It was in the amount of $100,000, and stated "per agreement with Debtor, as reduced from $227,000," which was the amount of the debt set forth in the Debtor's Original Schedules. The Debtor and his counsel asked the Debtor's Parents to reduce their claim, and asserted the reduction in opposition to Karton's motion to dismiss the Debtor's chapter 13 case for lack of eligibility under 11 U.S.C. § 109(e). The Debtor's counsel prepared the Debtor's Parents' $100,000 proof of claim. The Debtor had actual knowledge that the Debtor's Parents were going to file that

proof of claim. The Debtor asserted the reduction in the amount of the Debtor's Parents' claim in successfully opposing Karton's motion to dismiss his chapter 13 case. The Debtor, and the Debtor's counsel filed pleadings and made representations to me and Karton that the Debtor's Parents' claim had been so reduced by mutual agreement with the Debtor. They did not tell me at the time or disclose to Karton that any condition was imposed on that reduction.

16. The Debtor's Parents' second proof of claim was filed after the Conversion Date and was asserted in the amount of $227,150. The Debtor has not objected to the increased claim amount or asked his parents to withdraw the second proof of claim. The Debtor now asserts that the reduction of the Debtor's Parents' claim before the Conversation Date was conditioned on his confirmation or consummation of a chapter 13 plan. This condition was concealed from Karton and me prior to the Conversion Date.

17. The Debtor's marital dissolution decree from the superior court established his obligations for spousal support and child support on an ongoing basis. The decree expressly provides for an increase in both spousal support and child support equal to a total of 25 percent of the amount by which the Debtor's income exceeds $17,000 per month. The Debtor knew of these provisions at all relevant times.

18. The Debtor had at least two meetings with Eric Alcorn, an authorized representative of the University of Southern California ("USC"), during the week immediately before and after the Petition Date. USC was the Debtor's employer at the time. Mr. Alcorn informed the Debtor in those meetings that his future monthly paychecks would be no more than approximately $16,250 per month, commencing in November 1999, including money payable to the Debtor from a rapidly declining surplus account ("Surplus") maintained for the Debtor's benefit by USC and which the Debtor did not disclose in his Original Schedules or Amended Schedules. The Debtor received no more than $16,250 in income from USC in any month after October 1999. No representative of USC informed the Debtor he would be permitted to draw more than $16,250 per month at anytime after October 8, 1999. As a result of this and all other evidence offered by the Debtor, I conclude that he had no basis for stating under oath in the Amended Schedules that his income would be nearly $21,000 per month. The Debtor's efforts at trial to persuade me to the contrary were unconvincing. Even if the Debtor had been able to persuade me that his income had increased to $21,000 per month, his support obligations would have increased as a result by $978 per month, consuming the $850 per month the Amended Plan proposed to pay unsecured creditors over the 60–month life of the Amended Plan. The Debtor intentionally overstated his income and understated his support and income tax obligations in the Amended Schedules.

19. The Debtor disclosed no accounts receivable in the Amended Schedules even though he actually received and collected checks for at least $4,200 from prepetition accounts during the chapter 13 case. After the Petition Date the Debtor delivered each of these checks to Davidson for deposit into the Trust Account and spent the proceeds from these checks on his personal post-petition expenses. Neither these receivables nor their collection, nor the payments made on the Debtor's behalf by Davidson were disclosed in the Original Schedules, the Amended Schedules, or any other pleading filed with this court, except in response to discovery in this lawsuit.

20. Records relating to his accounts receivable were not maintained by the Debtor personally. Those records were maintained by his assistant at USC. The Debtor never asked anyone at USC for a complete listing of the receivables owing to him, either as related to his employment at USC or as part of his process of completing the Original Schedules or the Amended Schedules, or at any other time.

21. The Debtor owned an interest in Hydrotech Surgical, Inc. ("HSI") on the Petition Date. The interest in HSI is not listed in the Original Schedules and is listed in the Amended Schedules with a value of "NONE." On December 31, 1999 the Debtor received a check in the amount of $2,965.17 as a distribution from HSI (the "HSI Distribution"). The Debtor deposited the HSI Distribution in the Trust Account and spent it on his personal living expenses. The Debtor's receipt of the HSI Distribution was not disclosed in any pleading filed with this court prior to the Conversion Date.

22. The Amended Plan provided for distributions to unsecured creditors in the amount of $50,999 over a period of five years. The Amended Plan stated that unsecured creditors would receive $50,905 from a liquidation under chapter 7. The chapter 7 liquidation analysis did not include the funds in the Trust Account on the Petition Date, the Debtor's receivables, the USC Surplus, the HSI Distribution, or any equity in the Debtor's residence. It was also based on the Debtor's overstated income and understated support and income tax obligations in the Amended Schedules and, therefore, was unreasonable and the Debtor's Amended Plan therefore was infeasible.

23. The chapter 7 trustee later sold the Debtor's residence for approximately $560,000, $100,000 more than the Debtor listed as the value of his home in the Amended Schedules.

24. The Debtor had at least a contingent right to require USC to deliver to him the USC Surplus as of the Petition Date if he did not use the USC Surplus by continuing to draw more than he was generating in fee income postpetition. The USC Surplus should have been disclosed in the Original Schedules and in the Amended Schedules.

25. The Amended Schedules contained the following errors and omissions: they (a) understated the Debtor's spousal support and income tax obligations; (b) overstated the Debtor's reasonably anticipated income; (c) omitted any reference to the Trust Account, the Debtor's receivables, the USC Surplus, and the HSI Distribution; (d) understated (i) the value of the Debtor's primary residence and the HSI Stock and (ii) the Debtor's debt to the Debtor's Parents; and (e) failed to disclose (if it was so) that the reduction in the Debtor's debt to the Debtor's Parents from $227,150 to $100,000 was subject to a condition that the Debtor would be able to achieve confirmation or consummation of a chapter 13 plan. At all times prior to the conversion of his case from chapter 13 to chapter 7, the Debtor had actual knowledge of those errors or omissions or he made them in reckless disregard of his obligation to accurately report the truth to his creditors and to the court. The misrepresentations were material. The Debtor made these misrepresentations knowingly and fraudulently.

26. But for these intentional omissions and errors it would have been self-evident that the Debtor could not confirm a chapter 13 plan and the case could have been converted to chapter 7 or dismissed before the Debtor could have spent the proceeds of the accounts and other assets that he dissipated during the chapter 13 case.

Looked at separately, at least some of the Debtor's individual misstatements might be deemed to be minor and immaterial or not the result of fraudulent intent by the Debtor. Collectively, and in the context of the Debtor's ongoing dispute with Karton, the errors related to material facts, were misrepresentations, and were made with an intent on the Debtor's part to deceive Karton and the court.

27. The chapter 13 case, the original plan and the Amended Plan all were filed as part of a scheme to hinder, delay and defraud Karton by (a) obtaining a return of the $56,000 of Levied Cash in exchange for an agreement to pay creditors pursuant to a 5-year repayment plan; (b) investing that Levied Cash in the Debtor's residence, which he claimed as exempt; and (c) then converting the Debtor's case to a case under chapter 7 before making the payments to creditors under the plan. This is established from the facts that the Debtor had actual knowledge that his income was far less than he would have needed to maintain his promised payments under the plan or the Amended Plan, and the Debtor had no reasonable basis for believing his disposable income would increase to an amount sufficient to fund his promised payments thereunder before he would have defaulted. The Debtor made the above set forth multiple misrepresentations and omissions from the Original Schedules and the Amended Schedules as part of this scheme. Such misrepresentations and omissions were made knowingly and fraudulently.

28. The Debtor's Parents' $100,000 proof of claim was asserted fraudulently by the Debtor because it was designed and asserted by the Debtor to mislead me and creditors by concealing the intent that the Debtor asserted only much later that the reduction of their claim from $227,150 to $100,000 was conditioned on the confirmation or consummation of the Debtor's chapter 13 plan. If this condition existed, as the Debtor now says it did, the Debtor's concealment of the condition during the chapter 13 stage of his bankruptcy case was false, material, deceptive, reasonably and justifiably relied upon by Karton, and resulted in damage to Karton.

### Conclusions of Law

29. Any of the foregoing findings of fact that is deemed to be a conclusion of law is hereby adopted as a conclusion of law; any of the following conclusions of law that is deemed to be a finding of fact is hereby adopted as a finding of fact.

30. The Debtor is legally responsible for the substantial inaccuracies and omissions in the Original Schedules. Under the circumstances herein, the filing of the Original Schedules requires denial of the Debtor's discharge under 11 U.S.C. § 727(a)(4).

31. Because the Debtor established the Trust Account and the Loan Proceeds Account with the actual intent to hinder, delay, or defraud creditors, including without limitation Karton, the Debtor's discharge must be denied under 11 U.S.C. § 727(a)(2)(A).

32. Taken collectively, the Debtor's errors and omissions in the Original Schedules and Amended Schedules, and his decision not to disclose to me that the alleged reduction in the Debtor's Parents' claim was conditioned on confirmation of a chapter 13 plan, constitute (a) the knowing and fraudulent making of a false oath, and (b) the presentation or use of a false claim, within the meaning of 11 U.S.C. § 727(a)(4). Therefore, the Debtor's discharge must be denied under 11 U.S.C. § 727(a)(4).

33. These findings of fact and conclusions of law render unnecessary any con-

clusion of law under 11 U.S.C. § 523(a)(2)(A) or (a)(6).

ORDER

IT IS SO ORDERED.